## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 09 2015, 8:55 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT

Scott King
Lakeisha Murdaugh
Scott King Group
Merrillville, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Chandra K. Hein
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Shelben Curtis,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | June 9, 2015<br><br>Court of Appeals Case No.<br>45A03-1410-CR-365<br><br>Appeal from the Lake Superior Court<br><br>The Honorable Samuel L. Cappas, Judge<br><br>Case No. 45G04-1203-FA-7 |

**Brown, Judge.**

[1] Shelben Curtis appeals his convictions and sentence for voluntary manslaughter as a class A felony and aggravated battery as a class B felony. Curtis raises four issues, which we revise and restate as:

I. Whether the trial court abused its discretion in admitting certain evidence;

II. Whether the evidence is sufficient to sustain his convictions;

III. Whether the court abused its discretion in sentencing him; and

IV. Whether his sentence is inappropriate in light of the nature of the offense and his character.

We affirm.

## Facts and Procedural History

[2] Theodore Roe attended Calumet High School, and during his senior year the school determined that he needed to be placed in the guidance office because he was harassed by and afraid of Shelton, who was Curtis's son, and James Love. After he graduated, Roe was attacked by Shelton and sustained injuries which included part of his ear being cut off, and Roe and his father reported the incident to police.

[3] On one day in late July 2011, Roe picked up his girlfriend Maranda Cuevas, his sister Cassandra, and Cassandra's boyfriend Cameron Jimerson from a hotel and drove to a residence near 46th Avenue and Roosevelt Street to drop off Jimerson. After dropping him off, Roe drove Cassandra and Cuevas to a D-Mart gas station about two minutes away. As Roe was pumping gasoline,

Shelton and Love pulled into the D-Mart lot in a black vehicle and "kind of circle[d] the gas station." Transcript at 328. Shelton and Love stared "[e]villy" at Roe and those with him and gave them "dirty looks." *Id.* at 228, 329. Roe entered his vehicle and "took off." *Id.* at 229. Cassandra observed that Shelton and Love had exited their vehicle and had walked toward the gas pump used by Roe. As Roe drove away, Cuevas noticed that Shelton and Love "were kind of gesturing like as if they wanted to fight or just - not very nice." *Id.* at 331. Shelton and Love returned to their vehicle, pulled out of the D-Mart lot, and drove in the same direction as Roe. Cassandra called Jimerson, and someone called Roe's father, who called the police.

[4] Roe drove back to 46th Avenue and Roosevelt Street, and Jimerson entered the vehicle. Roe drove a short distance, and the black vehicle driven by Shelton reappeared behind his vehicle "out of nowhere." *Id.* at 394. Roe eventually stopped his vehicle, and Jimerson exited it so that he could attempt to speak with Shelton. Jimerson told the others to stay in the car, and he walked slowly towards Shelton's vehicle with his hands up. Shelton started screaming profanities, stated that he was going to kill Jimerson, made a "gun gesture" towards Jimerson and Roe, and then sped away. *Id.* at 240.

[5] Jimerson entered Roe's vehicle, and Roe drove back to 46th Avenue and Roosevelt Street. As Jimerson was stepping out of the vehicle, the vehicle previously driven by Shelton turned the corner and drove towards Roe's vehicle. Shelton, Curtis, Love, and Curtis's daughter Shaquita exited the vehicle, and Jimerson and Roe exited Roe's vehicle.

[6]     Curtis started to run towards Jimerson, and Shelton and Love began to run towards Roe. Jimerson raised his hands and asked what was going on and "what's the problem with these kids." *Id.* at 404. Curtis continued to approach Jimerson with his fists up and said "you want to bang, let's bang." *Id.* Curtis "gave [Shelton] a little nudge," and Shelton stepped forward and started to strike Roe. *Id.* at 340. Shelton and Love punched and pushed Roe. Shaquita struck Cuevas and Cassandra. Jimerson stepped in front of Shaquita with his arms out to back her away, and Curtis joined Shelton and Love in striking Roe. Jimerson then ran towards Curtis, placed his arms out, and tackled him with his forearm, and they fell to the ground.

[7]     As soon as Curtis and Jimerson hit the ground, Curtis reached behind his back and pulled out a .40 caliber semiautomatic pistol. Jimerson attempted to grab Curtis's arm to keep him from pointing the gun at him. As they struggled, Curtis was able to pull back the slide and cock the gun. Jimerson began to stand up, pushed Curtis, and attempted to turn away. While Jimerson was within a few feet, Curtis shot Jimerson in the back, and Jimerson felt his legs stop working and fell to the ground. Roe had backed away across the street. Curtis then crossed the street moving towards Roe, Cassandra, and Cuevas. Curtis fired his pistol at Roe's chest, and Roe threw his hands on his chest, stumbled, and fell down in the grass. Curtis went toward his vehicle and said to the others with him "come on. Come on. Let's go." *Id.* at 421. Before Curtis and the others entered their vehicle, police swarmed the intersection. Roe died at the scene, and Jimerson was permanently paralyzed from the waist down.

[8] In March 2012, Curtis was indicted on Count I, voluntary manslaughter for killing Roe, a class A felony; and Count II, aggravated battery for inflicting injury on Jimerson that caused protracted loss of impairment of the function of a bodily member, a class B felony. A jury trial was held on June 23, 25, 26, and 30, 2014. On June 23, 2014, Curtis filed a motion *in limine* stating that the State may seek to admit evidence of a confrontation involving Roe and Shelton at a gas station earlier in the day of the shooting and arguing that evidence would violate Ind. Evidence Rules 401, 402, and 403. The court heard arguments on the motion, and Curtis argued that he was not present at the gas station, that the jury may be misled into thinking the shooting was a continuation of a battery or attempted battery involving him, and that the risk of misleading the jury and confusing the issue outweighs the benefit of completing the story by way of background. The State argued that there was an ongoing feud between Shelton and Roe and that the D-Mart incident shows that Curtis by way of his son was the initial aggressor and was not acting in self-defense. The parties agreed that the D-Mart incident occurred on the same day and somewhere inside or just outside of an hour from the time of the shootings. The trial court found that "to my mind it sounds like the fight at the D-Mart puts the Voluntary Manslaughter and Aggravated Battery in context. I think it is relevant. I don't think it is prejudicial or misleading. I am going to allow that testimony in." *Id.* at 16. During the trial, the State presented testimony from multiple witnesses that neither Roe nor Jimerson had any weapon in his hands when Curtis shot them. It also presented testimony that Shelton did not have any cuts, scrapes, bruises, broken skin, or something that looked like he had

been hit by a pipe. Cuevas testified that, at some point, Roe had an ax handle and that she had at one point remembered Roe going toward Curtis with an ax handle.

[9] The trial court also admitted the grand jury testimony of Curtis into evidence. Curtis testified before the grand jury that he received a call from a neighbor stating that two guys and a girl were about to jump on Shelton with some pipes and that he and Shaquita drove to the area to see what was going on with Shelton. Curtis testified that he observed Roe twice swing a pipe, which he later stated looked more like a handle, at Shelton, that he hit him in the head the first time, that the swing was a full swing, and that he hit him around the head area the second time. Curtis testified that he ran over to separate Roe and Shelton, that Jimerson then hit him on the side of his head from behind with what felt like a heavy object, and that he fell on his back and drew his weapon. Curtis further testified that, when he was on the ground, Roe moved towards him with the pipe or handle, and that he shot him. He testified that, after he shot Roe, Jimerson came towards him and he shot him. Evidence was admitted that Curtis weighed approximately 300 pounds and was approximately six feet tall, that Jimerson weighed approximately 250 pounds and was six feet and three inches tall, and that Roe weighed 145 pounds and was five feet and ten inches tall. The jury found Curtis guilty on both counts.

[10] In its sentencing order, the court found that, as to each count, the nature and circumstances of the crime was a significant aggravating circumstance in that Curtis was the only individual with a firearm, that he could have easily avoided

the altercation altogether, and that he drove to the scene of the altercation with his weapon. It also found that, as to Count II, there was an aggravator in that the injury suffered by Jimerson was significant and greater than the elements necessary to prove the commission of the offense. As mitigating circumstances, the court found that Curtis had no criminal history and had led a law-abiding life for a substantial period before the crime. The court also specifically rejected self-defense as a mitigating circumstance. At the sentencing hearing, the court stated that Curtis "brought a gun to a fistfight, which is excessive use of force from my perspective." *Id.* at 722. The court also said that, if someone had swung the ax handle as hard as it was alleged, people would have sustained far more serious injuries than those sustained by Shelton and that it did not believe Curtis was struck with the ax handle. The court found that the aggravating circumstances outweighed the mitigating circumstances and sentenced Curtis to thirty-five years for his conviction under Count I and fifteen years for his conviction under Count II, to be served consecutively for an aggregate sentence of fifty years. Curtis filed a motion to correct error, which the court denied.

## *Discussion*

### I.

The first issue is whether the trial court abused its discretion in admitting certain evidence regarding the previous incident at D-Mart involving Shelton and Roe. Generally, we review the trial court's ruling on the admission of evidence for an abuse of discretion. *Noojin v. State,* 730 N.E.2d 672, 676 (Ind. 2000). We reverse only where the decision is clearly against the logic and effect

of the facts and circumstances. *Joyner v. State,* 678 N.E.2d 386, 390 (Ind. 1997), *reh'g denied.* Even if the trial court's decision was an abuse of discretion, we will not reverse if the admission constitutes harmless error. *Fox v. State*, 717 N.E.2d 957, 966 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*.

[12] Curtis cites Ind. Evidence Rules 402 and 403 and argues that the evidence regarding the D-Mart incident did not prove or disprove the charges against him and amounted to highly prejudicial and irrelevant evidence. He further argues that the first time the alleged victims saw him was when he arrived at the scene of the incident, that the State did not show he was aware of what had actually taken place at D-Mart aside from what Shelton told him, and that thus the evidence regarding the D-Mart incident was not relevant. He further argues that the "stand-up-to-the-bully" theme repeated by the State throughout the trial placed him in grave peril and denied him a fair trial.

[13] The State maintains that the evidence of the D-Mart incident was relevant because it triggered the escalating conduct that culminated in Curtis shooting two unarmed people, and that as such it showed the reason for Curtis's criminal conduct. It argues that the evidence showed why Curtis entered his vehicle and pursued the victims and that it provided context to the series of events that culminated in the shootings. The State further argues that evidence of the D-Mart incident was not unduly prejudicial, that the State limited the evidence to the simple facts, and that the court monitored the mode and manner in which evidence was admitted. The State also contends that, even if the trial court erred, any such error was harmless, the evidence of Curtis's guilt was

overwhelming, several eyewitnesses observed Curtis initiate and incite violence as Jimerson attempted to reason with him, and that Curtis shot Jimerson in the back and Roe in the chest as Roe was backing away.

[14] Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Ind. Evidence Rule 401. Evidence of motive is always relevant in the proof of a crime. *Camm v. State*, 908 N.E.2d 215, 223 (Ind. 2009) (citing *Wilson v. State*, 765 N.E.2d 1265, 1270 (Ind. 2002)), *reh'g denied*; *Ross v. State,* 676 N.E.2d 339, 346 (Ind. 1996).

[15] While relevant evidence is admissible, Ind. Evidence Rule 402, it may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence. Ind. Evidence Rule 403.

[16] In applying the balancing test of Evidence Rule 403, the trial court has "wide latitude," and its determination is reviewed for an abuse of discretion. *Willingham v. State*, 794 N.E.2d 1110, 1116 (Ind. Ct. App. 2003). The Indiana Supreme Court has "emphasized that the relevant inquiry is not merely whether the matter is prejudicial to the defendant's interests, but whether 'it is *unfairly* prejudicial.'" *Baer v. State*, 866 N.E.2d 752, 763 (Ind. 2007) (quoting *Steward v. State*, 652 N.E.2d 490, 499 (Ind. 1995), *reh'g denied*), *reh'g denied*, *cert. denied*, 552

U.S. 1313, 128 S. Ct. 1869 (2008).  All relevant evidence necessarily is "prejudicial" in a criminal prosecution, and the danger of unfair prejudicial impact "arises from the potential for a jury to substantially overestimate the value of the evidence, or its potential to arouse or inflame the passions or sympathies of the jury."  *Wages v. State*, 863 N.E.2d 408, 412 (Ind. Ct. App. 2007), *reh'g denied*, *trans. denied*.

[17]  The evidence regarding the events at D-Mart involving Roe and Shelton was relevant.  The evidence had a tendency to make the existence of facts of consequence more or less probable than without the evidence.  The testimony relating to the interactions at D-Mart of Shelton and Love with Roe and those riding in his vehicle provided context for the subsequent testimony regarding the altercation and shootings which occurred a short time later near 46th Avenue and Roosevelt Street, and helped explain Curtis's involvement in the altercation and shootings.  The evidence showed that Shelton and Love wished to fight, helped set forth the escalating conduct of the various participants and Curtis in the altercations, and provided the setting, circumstances, and context related to Curtis's actions of entering a vehicle and pursuing and confronting Roe and Jimerson.  The evidence helped explain Curtis's relationship with Shelton, Roe, and Jimerson as well as any motive he may have had to harm Roe and Jimerson.  Also, the evidence related to Curtis's alleged motive to defend his son and his claim of self-defense, including whether Curtis participated willingly in or provoked the violence, entered into combat or was

the initial aggressor and did not withdraw from the encounter, or used more force than necessary to repel an attack.

[18] In addition, the evidence regarding the events at D-Mart was not unduly or unfairly prejudicial to Curtis. The record reveals that the testimony presented regarding the interactions of Roe and Shelton at D-Mart was not the principal evidence or focus of the State's case against Curtis. The State presented extensive testimony and evidence regarding the altercation at 46th Avenue and Roosevelt Street and the shootings by Curtis. In light of the focus of the extent of evidence presented regarding the events at D-Mart relative to the lengthy and detailed testimony and other evidence regarding the subsequent altercation, Curtis's actions and role in the altercation, and the shootings by Curtis, we conclude that any potential for the evidence to inflame the passions or sympathies of the jury was not significant and thus any danger of unfair prejudicial impact against Curtis was minimal. Also, as to Curtis's argument that the State improperly focused on the theme that Roe had been bullied, we note the trial court told the jury that it was not to infer any knowledge by Curtis regarding any alleged previous scuffles and fights.

[19] Based upon the record, we cannot say the trial court abused its discretion in admitting evidence regarding the events at D-Mart shortly before the altercation and shootings. *See Utley v. State*, 699 N.E.2d 723, 728 (Ind. Ct. App. 1998) (finding that the nature of the defendant's relationship with the victim was highly probative and relevant to explain the context of the argument which

preceded the events which culminated in the victim's death and any motive the defendant may have had to harm the victim), *trans. denied*.

## II.

The next issue is whether the evidence is sufficient to sustain Curtis's convictions. The standard of review for a challenge to the sufficiency of evidence to rebut a claim of self-defense is the same as the standard for any sufficiency of the evidence claim. *Wilson v. State*, 770 N.E.2d 799, 801 (Ind. 2002). We neither reweigh the evidence nor judge the credibility of witnesses. *Id.* Additionally, if there is sufficient evidence of probative value to support the conclusion of the trier of fact, then the verdict will not be disturbed. *Id.*

A valid claim of self-defense is legal justification for an otherwise criminal act. *Coleman v. State*, 946 N.E.2d 1160, 1165 (Ind. 2011). At the time of the offense, Ind. Code § 35-41-3-2 provided in part that a person is justified in using reasonable force against another person to protect the person or a third person from what the person reasonably believes to be the imminent use of unlawful force. However, according to the statute, a person is not justified in using force if the person is committing or is escaping after the commission of a crime, the person provokes unlawful action by another person with intent to cause bodily injury to the other person, or the person has entered into combat with another person or is the initial aggressor unless the person withdraws from the encounter and communicates to the other person the intent to do so and the other person nevertheless continues or threatens to continue unlawful action.

In order to prevail on a claim of self-defense, a defendant must show he was in a place where he had a right to be, he acted without fault, and he had a reasonable fear of death or great bodily harm. *Coleman*, 946 N.E.2d at 1165. The amount of force a person may use to protect himself depends on the urgency of the situation. *Harmon v. State,* 849 N.E.2d 726, 730-731 (Ind. Ct. App. 2006). However, if a person uses more force than is reasonably necessary under the circumstances, his self-defense claim will fail. *Id.* at 731. "Where a person has used more force than necessary to repel an attack the right to self-defense is extinguished, and the ultimate result is that the victim then becomes the perpetrator." *Hollowell v. State,* 707 N.E.2d 1014, 1021 (Ind. Ct. App. 1999) (citation omitted). When a claim of self-defense is raised and finds support in the evidence, the State has the burden of negating at least one of the necessary elements. *Wilson*, 770 N.E.2d at 800. The State may meet this burden by rebutting the defense directly, by affirmatively showing the defendant did not act in self-defense, or by simply relying upon the sufficiency of its evidence in chief. *Miller v. State*, 720 N.E.2d 696, 700 (Ind. 1999). Whether the State has met its burden is a question of fact for the fact-finder. *Id.*

Curtis maintains that he was in a place that he had a right to be when he traveled to 46th Avenue and Roosevelt Street and that he did not instigate the altercation. He argues that he was struck from behind by Jimerson, that while he was on the ground Roe ran towards him with an ax handle and he fired a single shot at him, and that he fired a shot at Jimerson when Jimerson charged at him. Curtis also argues that a reasonable person in his shoes "would have

felt that force was necessary to prevent one from being injured or even killed by an aggressor, particularly when armed with an ax handle and/or an aggressor of the size of [Jimerson]." Appellant's Brief at 14. The State maintains that Curtis shot Jimerson in the back and shot Roe in the chest as Roe was backing away, that Curtis had a semiautomatic pistol and Roe and Jimerson were unarmed, and that Curtis was larger than Jimerson and Roe.

[24] The evidence favorable to the convictions reveals that Curtis, together with his son Shelton, Love, and Shaquita, drove near the intersection of 46th Avenue and Roosevelt Street, they confronted Roe and Jimerson, and that a physical altercation ensued. Curtis had a semiautomatic pistol with him when he attacked Roe and Jimerson tackled him. After he was tackled by Jimerson, Curtis drew his pistol. Jimerson began to stand up, pushed Curtis, and attempted to turn away, and Curtis fired his pistol at Jimerson. The bullet struck Jimerson in the back, and he fell to the ground. Curtis then crossed the street towards Roe and fired his pistol at Roe. The bullet struck Roe in the chest, and he grabbed his chest, stumbled, and fell to the ground.

[25] Based upon the record, the jury could infer from the testimony that Curtis participated willingly in or provoked the violence, entered into combat or was the initial aggressor and did not withdraw from the encounter, did not have a reasonable fear of death or great bodily harm, or used more force than necessary to repel an attack under the circumstances. To the extent Curtis points to evidence regarding his or Jimerson's size, that Roe possessed an ax handle, or that Roe and Jimerson attacked or attempted to attack him, we will

not reweigh the evidence or judge the credibility of witnesses as to whether Curtis established a valid self-defense claim. We conclude based upon the record that the State presented evidence of a probative nature from which a reasonable jury could have determined beyond a reasonable doubt that Curtis did not validly act in self-defense and that he was guilty of the charged offenses. *See Rodriguez v. State,* 714 N.E.2d 667, 670-671 (Ind. Ct. App. 1999) (noting that the defendant's version of events differed from other testimony, declining to reweigh the evidence, and holding that sufficient evidence existed to rebut the defendant's claim of self-defense), *trans. denied*; *Hollowell*, 707 N.E.2d at 1021 (finding that the defendant being struck in the mouth was not life-threatening enough to justify self-defense with a knife and that there was sufficient evidence from which the jury could reasonably find that the defendant did not validly act in self-defense).

## III.

[26] The next issue is whether the court abused its discretion in sentencing Curtis. An abuse of discretion occurs if the decision is "clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom." *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218 (Ind. 2007). A trial court abuses its discretion if it: (1) fails "to enter a sentencing statement at all;" (2) enters "a sentencing statement that explains reasons for imposing a sentence – including a finding of aggravating and mitigating factors if any – but the record does not support the reasons;" (3) enters a sentencing statement that

"omits reasons that are clearly supported by the record and advanced for consideration;" or (4) considers reasons that "are improper as a matter of law." *Id.* at 490-491. If the trial court has abused its discretion, we will remand for resentencing "if we cannot say with confidence that the trial court would have imposed the same sentence had it properly considered reasons that enjoy support in the record." *Id.* at 491. The relative weight or value assignable to reasons properly found, or those which should have been found, is not subject to review for abuse of discretion. *Id.*

[27] The determination of mitigating circumstances is within the discretion of the trial court. *Rogers v. State*, 878 N.E.2d 269, 272 (Ind. Ct. App. 2007), *trans. denied*. The trial court is not obligated to accept the defendant's argument as to what constitutes a mitigating factor, and a trial court is not required to give the same weight to proffered mitigating factors as does a defendant. *Id.* An allegation that the trial court failed to identify or find a mitigating factor requires the defendant to establish that the mitigating evidence is both significant and clearly supported by the record. *Anglemyer*, 868 N.E.2d at 493. If the trial court does not find the existence of a mitigating factor after it has been argued by counsel, the trial court is not obligated to explain why it has found that the factor does not exist. *Id.*

[28] Curtis contends that the trial court improperly found that he was not justified in using force because the evidence supports the fact that Roe was moving toward him with an ax handle when Curtis shot him. He further argues that an aggravator that he was the only individual with a firearm is not a proper

aggravator as he was misled by his son as to what preceded the fight and that an ax handle is clearly a deadly weapon. Curtis also asserts the aggravator violated his rights under the Indiana Constitution to bear arms to defend himself, and that the court ignored evidence that supported self-defense as a mitigating circumstance.

[29] The State maintains that the nature and circumstances of the offense was a valid aggravator and that there was testimony that Roe could not defend himself. The State contends that the thrust of Curtis's argument is a request that his version of the facts be believed and that the trial court was not required to believe his version, or, even if it did, allocate it any mitigating weight.

[30] With respect to the court's finding that the nature and circumstances of the offense constitute an aggravator, even if the finding that Curtis was the only person in possession of a firearm did not support the aggravator, the court also found that Curtis could have avoided the altercation and that he had traveled to the scene of the altercation. The record supports this determination. Curtis, armed with his pistol, accompanied Shelton, Love, and Shaquita to the intersection of 46th Avenue and Roosevelt Street after Shelton and Love observed Roe, Cassandra, and Cuevas at D-Mart. Curtis was not required to pursue Roe and Jimerson or travel to their location, and the shootings could have been avoided if he had not. The court did not abuse its discretion in finding that the nature and circumstances of the offense constituted an aggravating circumstance. Further, Curtis does not challenge the aggravator that the injury suffered by Jimerson was significant and greater than the

elements necessary to prove the commission of the offense. Additionally, the jury rejected Curtis's self-defense claim, and the court acted within its discretion in rejecting self-defense as a mitigator in sentencing. Also, to the extent Curtis asserts the trial court abused its discretion by failing to give proper weight to his version of events, either with respect to his self-defense claim or his ability to avoid the altercation and shootings, we note that the court was not required to find Curtis's version credible, and the relative weight or value assignable to reasons properly found, or those which should have been found, is not subject to review for abuse of discretion. *Anglemyer,* 868 N.E.2d at 491. Based upon the record and under the circumstances, we cannot say the trial court abused its discretion in imposing its sentence.

## IV.

[31] The next issue is whether Curtis's sentence is inappropriate in light of the nature of the offense and his character. Indiana Appellate Rule 7(B) provides that this court "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [we find] that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Under this rule, the burden is on the defendant to persuade the appellate court that his or her sentence is inappropriate. *Childress v. State,* 848 N.E.2d 1073, 1080 (Ind. 2006).

[32] Curtis argues the court ignored evidence that supported self-defense and failed to take into account the actual evidence presented at trial when it considered

the nature of the offense. He argues that he is the father of eight children, he took full responsibility for his actions and immediately cooperated with authorities, he is very remorseful for what happened, he has led a law abiding life, and that he is a low risk to reoffend. The State maintains that the nature of the offense warrants an enhanced sentence, in that, after Curtis's son confronted Roe and Jimerson at the D-Mart, Curtis decided to join his son and engage in violence, he shot Jimerson in the back and Roe in the chest as Roe was backing away, as a result Jimerson is permanently paralyzed from the waist down and it took thirty minutes for twenty-year-old Roe to bleed out on the pavement, and that Curtis attempted to flee. The State also argues that Curtis had multiple opportunities to stop the violence and instead encouraged his son to fight and that Curtis showed a disregard for human life.

[33] Our review of the nature of the offense reveals that Curtis, together with his son Shelton, daughter Shaquita, and Love traveled to the intersection of 46th Avenue and Roosevelt Street where they confronted Roe and Jimerson, and that a physical altercation ensued. Curtis, armed with a semiautomatic pistol, attacked Roe and was tackled by Jimerson. After he was tackled, Curtis drew his weapon, and when Jimerson began to stand up and attempted to turn away, Curtis shot him in the back. Curtis crossed the street moving towards Roe, who had backed away, and shot him in the chest. Curtis attempted to flee, but was apprehended by police. Roe died at the scene, and Jimerson sustained injuries resulting in being permanently paralyzed from the waist down. Our review of the character of the offender reveals that, according to the presentence

investigation report (the "PSI"), Curtis had been arrested in 1984, 1992, and 1993 in Chicago on misdemeanor charges, but the charges were stricken. The PSI states that Curtis reported that he is very remorseful but feels it was self-defense, that he is saddened that one life is gone and another is mangled, that he has eight children, that he pays child support for one child, and that he was employed as a truck driver at the time of his arrest. Curtis's overall risk assessment score places him in the low risk to reoffend category.

[34] After due consideration, keeping in mind the violent nature of the offense leading to Roe's death and Jimerson's permanent injuries, we conclude that Curtis has not sustained his burden of establishing that his sentence is inappropriate in light of the nature of the offense and his character.

## Conclusion

[35] For the foregoing reasons, we affirm Curtis's convictions and sentence for voluntary manslaughter and aggravated battery.

[36] Affirmed.

Crone, J., and Pyle, J., concur.